# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSSEAN CRISPIN, | ) | 3:23-CV-1636 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF CONNECTICUT, et al., | ) | May 23, 2025 |
| *Defendants*. | ) | |

## INITIAL REVIEW ORDER RE: AMENDED COMPLAINT

*Pro se* Plaintiff Jossean Crispin, a sentenced inmate[1] at Corrigan-Radgowski Correctional Center ("Corrigan"), filed this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff's original complaint named numerous defendants. *See* Compl., ECF No. 1. Following the Court's August 19, 2024, Initial Review Order, which allowed only some of Plaintiff's claims to proceed, Plaintiff filed the present amended complaint. *See* Am. Compl., ECF No. 31. In the amended complaint, Plaintiff asserts twenty statutory and constitutional violation claims related to his time at Whiting

---

[1] Information on the Department of Correction ("DOC") website shows that Plaintiff was most recently admitted to the DOC on December 5, 2023, and sentenced on that same day to a term of imprisonment of three years for violation of his probation or conditional discharge. *See* Inmate Information, CONN. STATE DEP'T OF CORR., http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=339978 (last visited May 11, 2025). *See, e.g., Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006); *Kelley v. Quiros*, No. 3:22-CV-1425 (KAD), 2023 WL 1818545, at *2 (D. Conn. Feb. 8, 2023) (taking judicial notice of state prison website inmate locator information). The Court also takes judicial notice of filings reflecting that Plaintiff was incarcerated within DOC as of June 28, 2021, transferred to Whiting Forensic Hospital, returned to Garner Correctional Institution as of May 3, 2023, and released from DOC custody on June 1, 2023. *See Crispin v. Walker*, 21-CV-886, ECF Nos. 1, 14, 17.

Forensic Hospital and his associated state court prosecution.  *See generally id.*  Plaintiff also names thirty-eight Defendants.[2]  *Id.* at 3–10.

In subsequent filings, which the Court agreed to consider as part of this initial review, *see* Order, ECF No. 42; Order, ECF No. 44, Plaintiff asserts claims of retaliation against six Corrigan employees:  Warden Daniel Dougherty, Lieutenant Pearson, Counselor Supervisor Page, Lieutenant John Doe, Lieutenant Bragdon, and Unit Counselor Schmit.  *See* Mot. for Reconsideration, ECF No. 41; Emergency Mot., ECF No. 43.  Plaintiff alleges that these DOC employees have retaliated against him for his ongoing litigation against DOC and its officials across multiple lawsuits.

The Prison Litigation Reform Act requires federal courts to review complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity.  28 U.S.C. § 1915A(a).  Upon review, the Court must dismiss the complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.  28 U.S.C. §§ 1915(e)(2)(B), 1915A(b).

---

[2] Plaintiff names the following Defendants in his amended complaint:  Judge Joseph Schwartz, Waterbury Superior Court; the State of Connecticut; Department of Corrections ("DOC") Commissioner Angel Quiros; John Doe/Jane Doe #20, the Department of Mental Health & Addiction Services ("DMHAS") Police Commissioner; Jane Doe #1, Doctor at Whiting Forensic Division Hospital ("Whiting"); Jane Doe #2, Nurse at Whiting; John Does #3, #4, and #5, Forensic Treatment Specialists at Whiting; Jane Doe #6, Forensic Treatment Specialist at Whiting; Judge Dewey, Middletown Superior Court; John Does #7, #8, #9, #10, #11, and #12, DMHAS Police Officers; Jane Doe #13, Unit Director/Part of Treatment Team/Ex-DOC Employee, Whiting; John Does #14 and #15, Unit 4 Doctors/Part of Treatment Team, Whiting; Jacqueline Fitzgerald, State Attorney/Prosecutor; Ismian Feraizi, Attorney; Brittney Paz, Attorney; Georgios Tarasidis, Attorney; Mark McKey, Public Defender/Attorney; Peter Harvey, Attorney; Jane Doe #16, Attorney at Jay Ruane Law Firm; Domijan, Counselor Supervisor, DOC; Michael Sussel, Discharge Planner for Mentally Ill Prisoners; Denise Walker, Retired Prison Warden; Jennifer Peterson Reis, Prison Warden; John Doe #17, DMHAS Medical Director; Manick, Counselor Supervisor, DOC; Nick Rodriguez, District Administrator, DOC; Kelly Wolf, Doctor for Mental Health Prisoners, DOC; Jane Doe #18, Adult Probation Officer, Waterbury CT Superior Court; Jane Doe #19, Jail Divergent Social Work; and Ionouis Kaloidis, Attorney.  ECF No. 31 at 3–10.  All Defendants are sued in both their official and individual capacities.  *Id.* at 55.

The Court has thoroughly reviewed all factual allegations in the amended complaint and the filings at ECF Nos. 41 and 43, and conducted an initial review of the allegations therein pursuant to 28 U.S.C. § 1915A.[3]  Based on this initial review, the Court orders as follows.

## I.   FACTUAL BACKGROUND

While the Court has considered all Plaintiff's allegations in his amended complaint,[4] the Court recites here only those facts necessary to provide context for its ruling below.  The Court accepts the following allegations in Plaintiff's complaints as true for purposes of this initial review order.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff entered Whiting[5] on January 5, 2022.  ECF No. 31 at 15.  Upon arrival, Plaintiff met with his treatment team: Unit Director Jane Doe # 13 and Drs. John Doe #14 and #15.  *Id.* at 15.  Plaintiff's treatment team requested a detailed history of Plaintiff's pending civil and criminal cases.  *Id.* at 15.  Plaintiff provided the treatment team with a detailed list of his pending civil rights

---

[3] It is well-established that "*[p]ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'"  *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).  Notwithstanding this liberal interpretation, however, a *pro se* complaint will not survive dismissal unless the factual allegations meet the plausibility standard.  *See Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  A complaint that includes only "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s] devoid of further factual enhancement," does not meet the facial plausibility standard.  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

[4] "The Second Circuit has long held that an amended complaint completely replaces the original complaint," *Jordan v. Chiaroo*, No. 3:24-CV-204 (VAB), 2024 WL 3925375, at *3 (D. Conn. Aug. 23, 2024) (citing *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) (holding that the amended complaint completely replaces original complaint)), so the Court will not consider allegations from Plaintiff's original complaint in considering the factual basis for his claims.  *See Dinh v. Doe*, No. 3:24-CV-1042 (OAW), 2024 WL 3343006, at *3 (D. Conn. July 9, 2024) (noting that "the court will not consider any allegations made in the original complaint while evaluating any amended complaint.").

[5] The Court takes judicial notice that Whiting is an entity of the State of Connecticut's Department of Mental Health and Addiction Services and that it "specializes in providing inpatient services to individuals involved in the criminal justice system," including by means of Psychiatric Security Review Board commitment, criminal court order for restoration of competency to stand trial, and voluntary and involuntary civil commitment.  *See* Conn. Gen. Stat. § 17a-562; Connecticut Dept. of Mental Health and Addiction Services, Whiting Forensic Hospital, *available at* https://portal.ct.gov/DMHAS/WFH/Whiting-Forensic-Hospital (last visited May 11, 2025).

and habeas corpus cases. *Id.* The treatment team "showed visible signs and mannerism[s] of discomfort" at the list of cases. *Id.* at 16. Plaintiff then requested access to his legal materials to continue litigating his active cases. *Id.* Jane Doe #13 refused, telling Plaintiff that he would have to choose between receiving mental health treatment and litigating his cases because Plaintiff would not be allowed to do both. *Id.* Plaintiff told Drs. John Doe #14 and #15 this was unconstitutional and that he wanted to file a grievance. *Id.* at 16–17. The treatment team twice told Plaintiff that "there [wa]s no such thing" as a grievance. *Id.* at 17.

Plaintiff then called the in-house patient advocacy unit and explained to a patient advocate that the treatment team had prevented him from filing a grievance. *Id.* The patient advocate told Plaintiff that she would address this with the treatment team. *Id.* The patient advocate told the treatment team that they could not deny access to Plaintiff's legal materials. *Id.* at 18. Stymied by the patient advocate, the treatment team directed unknown hospital staff to take Plaintiff's pen and "refuse [him] legal copies," and to engage in other retaliatory acts. *Id.* Despite apparently lacking a pen, though, Plaintiff filed "multiple patient grievances" at Whiting, each asking that video be preserved as evidence of incidents he grieved. *Id.* at 20.

After filing one such grievance against Forensic Treatment Specialist Jane Doe #6 on or around February 4, 2022, John Doe #14 threatened Plaintiff, and hospital staff did not wake Plaintiff for breakfast the following day. *Id.* at 21. Plaintiff was "extremely hungry" when he awoke, so he walked down the hallway to the middle of the unit where breakfast is served. *Id.* Plaintiff noticed that breakfast was still being served so he asked for breakfast. *Id.* Jane Doe #6 denied Plaintiff breakfast, while Jane Doe #2 and John Does #3 and #4 were in the room. *Id.* Because food was within grasp, Plaintiff reached for a box of cereal and a carton of milk. *Id.* Jane Doe #6 then "shoved [Plaintiff] extremely violently and roughly about seven . . . feet away." *Id.*

at 22 (parentheses omitted).  When Plaintiff regained his footing, he waived his arm in the air as if to say "whatever" and started walking back to his room "fearing for [his] safety." *Id.*  As Plaintiff walked to his room, Jane Doe #6 followed him, calling Plaintiff "a piece of shit and an ass[ ]hole." *Id.*  Jane Doe #6 then pressed her body alarm, which "[i]nitiat[ed] a false code." *Id.*  Fifteen to twenty Whiting staff rushed into the unit.  *Id.* at 23.  Plaintiff told responding staff that Jane Doe #6 had assaulted him and that camera footage would show this.  *Id.*  Responding staff, some of whom Plaintiff had sued before, ignored Plaintiff's statements.  *Id.* at 23–24.  Plaintiff maintains that other staff in the unit "engaged in an immediate official cover up to conceal" Jane Doe #6's actions instead of protecting Plaintiff from Jane Doe #6.  *Id.* at 23 (caps omitted).

Hospital staff ordered Plaintiff to go to the "time-out room."  *Id.* at 25.  Plaintiff "either walked there or [was] physically forced there."  *Id.*  Plaintiff peeked into the door of the time-out room and immediately began having a claustrophobic panic attack.  *Id.* at 26.  The time-out room was a small, closet-sized room with padded blue walls and no windows.  *Id.*  Plaintiff expressed to "all" hospital staff and "Defendants" that he was at Whiting to recover from solitary confinement and that entering the time-out room would result in his "immediate mental decompensation."  *Id.* (caps omitted).  Dr. Jane Doe #1 ignored Plaintiff's pleas and ordered nearby hospital staff to physically force Plaintiff into the time-out room.  *Id.*  Plaintiff remained cooperative, but two male Forensic Treatment Specialists "grabbed [Plaintiff] extremely rough[ly]" while a third opened the door to the time-out room.  *Id.* at 26–27.  Staff members threw Plaintiff into the room, slammed the door in his face, and locked the door.  *Id.* at 27.

Once in the room, Plaintiff began having a claustrophobic anxiety attack.  *Id.*  Dr. Jane Doe #1 and Nurse Jane Doe #2 saw this and ordered staff to open the door to inspect Plaintiff, who was having trouble breathing, "sweating profusely," and "mentally decompensat[ing]." *Id.* Plaintiff had

difficulty speaking, but he was able to tell Dr. Jane Doe #1 and Nurse Jane Doe #2 that he could not breathe in the room and that he needed to get out or he would die. *Id.* at 28. Dr. Jane Doe #1 and Nurse Jane Doe #2 ignored Plaintiff's pleas and told him "no." *Id.* While the door remained open, Plaintiff "darted out" of the time-out room on his hands and knees. *Id.* Jane Doe #6 and John Does #3 through #5 and #7 through #10 immediately "[f]ootball[-]piled" on Plaintiff. *Id.* Plaintiff's arms and legs were twisted, causing him pain. *Id.* at 29. Plaintiff's pants ripped off, exposing his genitals and buttocks. *Id.* Dr. Jane Doe #1 ordered Nurse Jane Doe #2 to forcibly inject Plaintiff with an unknown medication. *Id.* Plaintiff maintains that all of these actions were taken to cover up Jane Doe #6's assault on Plaintiff. *Id.*

John Doe #11, a DMHAS officer, later informed Plaintiff that Jane Doe #6 was filing criminal charges against him. *Id.* at 30. Plaintiff gave his statement to John Doe #11 outlining the incidents described above. *Id.* Plaintiff claims John Doe #11 destroyed his statement and all evidence that would have incriminated Jane Doe # 6. *Id.* at 31.

Plaintiff was arrested for the incident with Jane Doe #6 approximately seven to ten days later. *Id.* Plaintiff was transported to Hartford Correctional Center to be arraigned on the new charges. *See id.* at 31–32. However, after meeting with Defendant Mark McKey, a public defender, Plaintiff was sent back to Whiting with a notice to appear in court at a later date. *Id.* at 33. After returning to Whiting, Plaintiff maintains he "continued to pursue" his criminal and civil litigation. *Id.* at 37. Plaintiff, however, was "[i]mmediately met with resistance" from Dr. Jane Doe #1. *Id.* The treatment team—consisting of the previous three members named above and the additional member of John Doe #15—told Plaintiff that he would not be allowed to mail out legal documents anymore. *Id.* Plaintiff tried to mail "multiple legal motions and forms," *id.* (caps omitted), to the Second Circuit, but a few days later Dr. Jane Doe #1 handed Plaintiff the

documents he had attempted to mail. *Id.* Plaintiff alleges hospital staff refused to mail out "any and all" of his legal mail. *Id.* at 34 (caps omitted). This resulted in Plaintiff's lawsuit in *Crispin v. Brady* being dismissed. *Id.* In fact, Plaintiff claims that Whiting staff's refusal to send out Plaintiff's legal mail resulted in dismissal of "a large number" of Plaintiff's civil rights cases and habeas corpus actions filed against Dr. Jane Doe #1, Nurse Heather, and Judge Joseph Schwartz. *Id.* (caps omitted). Plaintiff filed a grievance complaining this denied him access to the courts. *Id.* at 38.

Plaintiff was later transported to state court to answer his new criminal charges related to the incident with Jane Doe #6. *Id.* at 39. Plaintiff details several complaints against court participants, including a long succession of defense attorneys. *See id.* at 39–51. The Court will not describe those allegations in detail here because they cannot support a claim against these court participants for reasons described in the Court's initial review order. *See* Initial Review Order, ECF No. 28 at 8–12.

More than three years after the Whiting incident, Plaintiff also has asserted claims of retaliation against six Corrigan employees. Plaintiff alleges that despite knowing he has been designated to single cell status due to his mental health conditions, various Corrigan employees, including Warden Dougherty, Counselor Supervisor Page, Lieutenant Pearson, repeatedly attempted to force other inmates into Plaintiff's cell in an attempt to "entrap" Plaintiff into fighting them and then punish him for doing so via disciplinary proceedings. *See, e.g.*, ECF No. 43 at 4–5; *see also generally* ECF No. 41. As a result of these alleged retaliatory actions, Plaintiff reports that he is in "imm[i]nent danger." ECF No. 43 at 6. According to Plaintiff, the purpose of this "entrapment" is to "coerce" Plaintiff into dropping all lawsuits against the DOC and its officers. *Id.* at 4.

## II.    DISCUSSION

On initial review of the original complaint, the Court permitted only two claims to proceed: Plaintiff's excessive force claim brought under the Eighth or Fourteenth Amendments against Forensic Specialists Jane Doe #1 and John Doe #1, and his state common law assault and battery claims against these same two Defendants. ECF No. 28 at 27–28. The Court noted, however, that Plaintiff would only be able to proceed on *either* the Fourteenth Amendment excessive force claim *or* the Eighth Amendment excessive force claim, depending on his status as either a pretrial detainee or a sentenced prisoner on the date of the alleged assault. *Id.* at 19.

In his amended complaint, Plaintiff asserts claims for violations of his rights under the United States Constitution, federal law, and state law. Plaintiff seeks compensatory, punitive, and nominal damages from all named Defendants; a declaratory judgement indicating that all Defendants to this action engaged in collaboration; and injunctive relief in the form of a federal criminal investigation, a protective order, a cooperation order with regard to future civil litigation, and damages. ECF No. 31 at 54–55.

### A.    Damages Sought Against Defendants in Their Official Capacity

Plaintiff has sued all Defendants in both their individual and official capacities. *Id.* at 4. Further, Plaintiff has maintained his claim for damages against all Defendants. *Id.* at 3; *see also id.* at 54–55. For the reasons explained in the first initial review order, damages cannot be sought against Defendants who are sued in their official capacity. *See* ECF No. 28 at 5–7. Therefore, Plaintiff's claim for damages against Defendants in their official capacities remains dismissed because Plaintiff has not alleged that any exception to the state's Eleventh Amendment immunity applies. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

B.  Improper or Immune Defendants

In the initial review order, the Court dismissed claims against judicial defendants and the State of Connecticut and state agencies.

Plaintiff has again named Judge Joseph Schwartz of the Waterbury Superior Court and has now added Judge Dewey of the Middletown Superior Court as Defendants in the amended complaint.  *See* ECF No. 31 at 3, 5.  Plaintiff's claims asserted against these Defendants pertain only to their judicial acts.  *See id.* at 29–30, 33–36, 39–40, 44–45, 48–51.  For the reasons stated in the initial review order, claims against these Defendants are barred by judicial immunity.  *See* ECF No. 28 at 10–11.

Additionally, Plaintiff has again named the State of Connecticut as a Defendant in this action.  ECF No. 31 at 3.  For the reasons stated in the initial review order, claims against the State of Connecticut are again dismissed.  *See* ECF No. 28 at 11–12.

Finally, Plaintiff has again named Attorney Jacqueline Fitzgerald, Middletown State's Attorney, as a Defendant.  Prosecutors are entitled to absolute immunity from suit when acting in their discretionary roles in connection with a criminal proceeding.  *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) ("A prosecutor acting in the role of an advocate in connection with a judicial proceeding is entitled to absolute immunity for all acts intimately associated with the judicial phase of the criminal process." (internal citations and quotation marks omitted)).  Although somewhat unclear, the Court liberally construes at least some of Plaintiff's allegations as centering on prosecutors' decisions about how to proceed with his criminal charge in relation to the Whiting incident.  *See* ECF No. 31 at 39, 44.  Such decisions fall squarely into prosecutors' discretionary roles, and would therefore be barred by prosecutorial immunity.  To the extent Plaintiff asserts that Attorney Fitzgerald destroyed evidence, such allegations are considered below.

C.  <u>First Amendment Claims</u>

Plaintiff raises three First Amendment claims based on retaliation[6] for filing grievances and lawsuits, and interference with his access to the court.[7]  The Court discusses each in turn.

*1.  Whiting Retaliation Claims*

To plead a retaliation claim, an inmate must plausibly allege: (1) that he engaged in protected speech or conduct, (2) that the defendant took adverse action against the plaintiff, and (3) that the adverse action was the result of a retaliatory motive, i.e. that there was a causal connection between the protected conduct and the adverse action.  *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015).  To satisfy the causation element, a plaintiff must allege but-for causation.  *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019) (finding that causation in a First Amendment retaliation claim "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive") (citing *Hartman v. Moore*, 547 U.S. 250, 260 (2006)); *accord Handsome, Inc. v. Town of Monroe*, No. 23-711, 2024 WL 2747142, at *5 (2d Cir. May 29, 2024) (summary order).   In assessing whether but-for causation has been plausibly alleged, the Court looks to "'particularized evidence' that suggests a retaliatory motive, such as 'expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken.'"  *Handsome, Inc.*, 2024 WL 2747142, at *5 (quoting *Blue v. Koren*, 72 F.3d 1075, 1084 (2d Cir. 1995)).  The Court may also consider temporal proximity between the protected activity and the alleged retaliation.  *See A.S. City Sch. Dist. of Albany,* 585 F. Supp. 3d

---

[6] Although Plaintiff asserts a claim of "discrimination and retaliation against a qualified disabled individual" "for practicing civil rights action, the Court construes this as a claim alleging only retaliation based on the facts asserted in the complaint.

[7] Plaintiff also states a general claim of "violation of the 1st Amendment," but does not indicate what right under the First Amendment he is alleging was violated.  *See* ECF No. 31 at 2.  Therefore, the Court assumes that the two more specific violations discussed here encapsulate the extent of his First Amendment claims.

246, 269–70 (N.D.N.Y. 2022).   In the context of prisoner retaliation claims, the Second Circuit has "instructed district courts to approach [such] claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan*, 794 F.3d at 295 (internal quotation marks omitted).

While at Whiting, Plaintiff filed grievances and litigated his pending lawsuits. *See*, *e.g.*, ECF No. 31 at 20, 37.  Both activities constitute protected speech thus satisfying the first element. *See Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (filing a lawsuit or grievance is constitutionally protected activity and will support a retaliation claim).  Whiting staff also took actions against Plaintiff that could be considered adverse, in satisfaction of the second element, by allegedly taking Plaintiff's pen and legal materials, failing to wake him for breakfast, handling him roughly, calling him names, and forcibly medicating him.  *See* ECF No. 31 at 18, 21, 22, 27, 29.

But as with Plaintiff's original complaint, he has failed to allege in his amended complaint the necessary "causal connection" between his grievances and lawsuits and the adverse actions taken by any Whiting staff, except for Jane Doe #6.  While temporal proximity alone may be insufficient to establish a causal connection, *see*, *e.g.*, *Ford v. Deacon*, 793 F. App'x 13, 16 (2d Cir. 2019) (summary order) (noting that "temporal proximity alone, particularly where the time lapse is four months, is insufficient to establish a retaliation claim."), Plaintiff alleges that he filed a grievance against Jane Doe #6 the day before she assaulted him.  That tight temporal proximity leads the Court to conclude that Plaintiff has stated a claim for First Amendment retaliation against Jane Doe #6, for purposes of initial review.  As to the other Defendants involved in the alleged assault, however, Plaintiff has not adequately pleaded their knowledge of any protected activity he

engaged in or that retaliatory animus was a but-for cause of their actions. Likewise, although Jane Doe #1 was aware of at least one of Plaintiff's prior lawsuits given that she is a named defendant in one of them, Plaintiff has not alleged facts sufficient to show that his protected activity was a but-for cause of Jane Doe #1's actions toward him, as alleged in the amended complaint.

Specifically, Plaintiff recounts statements officials made about him ceasing his litigious activities, *see* ECF No. 31 at 16, 37, but the staff who made these statements—Jane Doe #1 and Jane Doe #13—did not personally take Plaintiff's pen and limit his access to legal copies, fail to wake him for breakfast, handle him roughly, call him names, or forcibly medicate him. To the extent any officials who made such statements were indirectly involved in the adverse actions described in Plaintiff's amended complaint, Plaintiff has failed to draw the requisite nexus between these statements and any actions taken by Defendants. *Cf. Johnson v. Naqvi*, No. 3:18-CV-694 (CSH), 2021 WL 1723773, at *6, 9 (D. Conn. Apr. 29, 2021) (concluding that there was an "apparent nexus" between correctional officer's strip search of plaintiff and his previous lawsuits against DOC officials where officer told plaintiff that he was being strip searched "since you like filing lawsuits.").

Plaintiff's theory of liability on this claim hinges upon an interagency conspiracy against him based on nothing more than his own perceptions. *See*, *e.g.*, ECF No. 31 at 24 (describing a "collaborated systemic attack of retaliation" by DOC, Whiting, and Waterbury Court Adult Probation without alleging any facts suggesting collusion in his amended complaint (caps omitted)). But just because Plaintiff continuously engaged in litigation against government officials during his confinement does not mean that every slight he suffered while confined was retributive. *See Dolan*, 794 F.3d at 295 (recognizing that "virtually any adverse action taken against a prisoner by a prison official . . . can be characterized as a constitutionally proscribed

retaliatory act.").

Consistent with the Second Circuit's instructions to approach retaliation claims with "skepticism and particular care," *id.*, the Court will not permit Plaintiff to proceed on his retaliation claim based upon his wholly conclusory assertions that all Defendants acted with a retaliatory motive when they allegedly took his adverse actions against him.  *See Barclay v. New York*, 602 F. App'x 7, 11 (2d Cir. 2015) (summary order) (holding that "[t]he district court . . . correctly ruled that [plaintiff's] First Amendment retaliation claim was entirely conclusory, as he had not pleaded any facts that suggested a retaliatory motive").  This claim remains dismissed as to all Defendants. *See* 28 U.S.C. § 1915A(b)(1).

### 2. *Corrigan Retaliation Claims*

Plaintiff also asserts retaliation claims against officers at Corrigan, where he is currently housed.  These claims, however, are impermissibly joined to the claims asserted in the amended complaint, and therefore, they are dismissed.

Federal Rule of Civil Procedure 20(a)(2) permits defendants to be joined in an action where, *inter alia*, the claims "aris[e] out of the same transaction, occurrence, or series of transactions and occurrences."    But where claims are "only tenuously related," joinder is not permissible.  *Mejia v. Kurtzenacker*, No. 3:21-CV-1222 (MPS), 2022 WL 4599037, at *6 (D. Conn. Sept. 30, 2022); *see also Webb v. Maldonado*, No. 3:13–CV–144 (RNC), 2013 WL 3243135, at *2 (D. Conn. June 26, 2013).  Although the alleged cause of retaliation is the same in both the amended complaint and these subsequent filings—namely, Plaintiff's many lawsuits against DOC officials—that is where the commonality ends.  The alleged location, time period, perpetrators, and retaliatory acts asserted in Plaintiff's filings at ECF Nos. 41 and 43 differ significantly from those asserted in Plaintiff's amended complaint.  Therefore, the Court finds that

joinder of these claims is improper, and they must be dismissed.  Should Plaintiff seek to file a new complaint with the Court regarding the alleged retaliation occurring at Corrigan, the Court will evaluate the merits of such a claim.

### 3. Access to the Courts Claims

The First Amendment to the United States Constitution (in conjunction with the other constitutional provisions) guarantees prisoners of the "right of access to the courts." *Lewis v. Casey*, 518 U.S. 343, 350 (1996); *see also Morello v. James*, 810 F.2d 344, 346 (2d Cir. 1987). Thus, prison officials are prohibited from "actively interfering with inmates' attempts to prepare legal documents or file them . . ." *Lewis*, 518 U.S. at 350 (internal citation omitted).  But, to prevail in a § 1983 access to courts claim, an inmate-plaintiff must demonstrate that a prison official "actually interfered with his access to the courts or prejudiced an existing action." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 345 (N.D.N.Y. 2010) (citations and quotation marks omitted). Thus, to show denial of access to the courts, an inmate must allege he suffered an "actual injury" resulting from Defendants' conduct.  *Lewis*, 518 U.S. at 351–53.

To establish an actual injury, Plaintiff must allege facts showing that Defendants took or were responsible for actions that hindered Plaintiff's efforts to pursue a "nonfrivolous" legal claim. *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002) ("Whether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost . . . plaintiff must identify a 'nonfrivolous,' 'arguable' underlying claim" that he sought to pursue or seeks to pursue in court." (citation omitted)); *see Lewis*, 518 U.S. at 353 (suggesting that the injury requirement of an access to courts claim is satisfied if an "inmate could demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded." (footnotes omitted)).  A "nonfrivolous" legal claim includes "a direct appeal of a criminal conviction, habeas petition, or civil rights action." *Jordan*

*v. Chiaroo*, No. 3:24-CV-204 (VAB), 2024 WL 3925375, at *4 (D. Conn. Aug. 23, 2024) (citing *Lewis*, 518 U.S. at 353).

Plaintiff alleges several instances in which Whiting medical staff took actions that purportedly impeded his ability to pursue a "nonfrivolous" legal claim. First, Plaintiff alleges Jane Doe #13 refused access to Plaintiff's legal materials, telling Plaintiff that he would have to choose between receiving mental health treatment and litigating his cases. ECF No. 31 at 16. But the patient advocate foiled that effort when she intervened on Plaintiff's behalf. *Id.* at 18. Next, Plaintiff claims that the treatment team directed unknown hospital staff to take Plaintiff's pen and refuse legal copies after the treatment team's initial efforts were unsuccessful. *Id.* But, in addition to failing to identify the staff members who took his pen and legal materials, this allegation is contradicted by other allegations in Plaintiff's complaint and the Court's own records. The same is true for Plaintiff's claim that Whiting staff prevented Plaintiff from filing court documents. *Id.* at 37.

While Plaintiff claims that Whiting staff took his pen, he maintains elsewhere in his amended complaint that he filed "multiple patient grievances" and legal filings with the Second Circuit while at Whiting. *Id.* at 20, 37. Inferring that Plaintiff would, at minimum, need a pen to do this, the Court need not accept his assertion that hospital staff took his pen or, at the least, can infer that if he was denied a pen for a period of time, his access to a pen was later reinstated. *See Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) (summary order) (stating that although "the court must generally accept as true all of the factual assertions in the complaint . . . there is a narrow exception to this rule for factual assertions that are contradicted by the complaint itself, [or] by documents upon which the pleadings rely").

Plaintiff's claim that hospital staff denied him access to a pen and his legal materials is also contradicted by records maintained by this Court.[8]  It is difficult to discern from the amended complaint when Plaintiff was at Whiting.  But the Court's records in Plaintiff's other civil rights cases provide some clarity on this point.  Plaintiff maintains in his amended complaint that he arrived at Whiting on January 5, 2022.  ECF No. 31 at 15.  Court records from his pending civil rights cases show that he filed a notice of change of address on January 20, 2022, in *Crispin v. Roach*, No. 20-CV-1184, *Crispin v. Haber*, No. 20-CV-1209, and *Crispin v. Fortin*, No. 20-CV-1796.  *See Roach*, ECF No. 65; *Haber*, ECF No. 78; *Fortin*, ECF No. 46.   Plaintiff's notice of change of address in all three cases notes his Whiting address.  *See ibid.*  Plaintiff filed another notice of change of address in *Roach* on May 3, 2022, reflecting a change in address to Garner Correctional Institution.  *See Roach*, ECF No. 75.  Plaintiff subsequently filed three more notices of change of address in *Roach*, but none listed a Whiting address.  *See Roach*, ECF Nos. 79, 113, 144.  Thus, the Court will infer from these notices of change of address that Plaintiff was at Whiting from approximately January 5, 2022, to approximately May 3, 2022.

From January 5, 2022, to May 3, 2022, nine of the ten lawsuits Plaintiff filed in the District of Connecticut were still pending in some form.  *See Roach*, No. 20-CV-1184 (filed August 14, 2020, and closed November 28, 2023); *Haber*, No. 20-CV-1209 (filed August 19, 2020, and closed December 14, 2022); *Fortin*, No. 20-CV-1796 (filed December 3, 2020, and closed January 10, 2023); *Crispin v. Brady*, No. 21-CV-229 (filed February 23, 2021, and closed January 6, 2022); *Crispin v. Peiri*, No. 21-CV-475 (filed April 5, 2021, and still pending); *Crispin v. O'Meara*, No. 21-CV-885 (filed April 9, 2021, and closed January 6, 2022); *Crispin v. Sussel*, No. 21-CV-885 (filed June 28, 2021, closed March 28, 2023); *Crispin v. Walker*, No. 21-CV-886 (filed June 28,

---

[8] *See Barletta v. Quiros*, No. 3:22-CV-01110 (SALM), 2023 WL 2687285, at *2 (D. Conn. Mar. 29, 2023) (noting that "[t]he Court may take judicial notice of its own records" (internal quotations and citations omitted)).

2021, and still pending); and *Crispin v. Anderson*, No. 21-CV-945 (filed July 9, 2021, and closed on January 27, 2022).

While at Whiting, Plaintiff filed nine documents in three of these pending cases. In *Roach*, Plaintiff filed documents on January 20, 2022 (ECF No. 65) (notice of change of address), February 28, 2022 (ECF No. 71) (motion for contempt), and April 4, 2022 (ECF No. 73) (motion for extension of time). In *Haber*, Plaintiff filed documents on January 20, 2022 (ECF Nos. 77, 78) (motion to appoint counsel and notice of change of address) and April 4, 2022 (ECF No. 83) (motion for extension of time). In *Fortin*, Plaintiff filed documents on January 20, 2022 (ECF Nos. 45, 46) (motion to appoint counsel and notice of change of address) and April 4, 2022 (ECF No. 51) (motion for extension of time). Each filing was handwritten, showing Plaintiff had access to a pen. Plaintiff's motion for contempt filed in *Roach* was also handwritten, *see* ECF No. 71, mailed from Whiting, *id.* at 32, cited extensive case law, *see id.* at 7–9, and was supported by exhibits that could only have come from Plaintiff's legal materials. *See id.* at 22–30. Taken together, these filings show not only that Plaintiff had access to a pen, but that he had access to his legal materials and had the ability to mail pleadings to the court from Whiting—all in direct contradiction of his claims that Whiting staff restricted Plaintiff's access to a pen and his legal materials. *See* ECF No. 31 at 18, 37.

Notwithstanding the record evidence of Plaintiff's filings, Plaintiff also claims that the treatment team told him he would not be allowed to mail out legal documents after he returned to Whiting from Hartford Correctional Center. *Id.* at 37. Plaintiff alleges Jane Doe #1 returned the "multiple legal motions and forms" he tried to mail to the Second Circuit, and that hospital staff refused to mail out "any and all" of his legal mail. *Id.* at 34, 37 (caps omitted). Plaintiff maintains

these actions of obstruction resulted in dismissal of "a large number" of Plaintiff's civil rights and habeas corpus actions, including his suit in *Crispin v. Brady*.  *Id.* at 34.

Plaintiff does not identify the type of "legal motion and forms" he attempted to mail to the Second Circuit, nor does he describe their content.  Likewise, Plaintiff does not describe the content of the habeas actions that were purportedly dismissed.  An access to courts claim requires "the underlying cause of action and its lost remedy [to] be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Christopher*, 536 U.S. at 416.  The underlying cause of action must be "described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id.*  Plaintiff's vague descriptions of his habeas cases and filings in the Second Circuit do not permit the Court to apply the "nonfrivolous" test to his underlying causes of action.  *See Amaker v. Fischer*, 453 F. App'x 59, 64 (2d Cir. 2011) (summary order) (affirming denial of a preliminary injunction for lack of standing to assert access to courts claim where a prisoner "[did] not specify what appeal was dismissed" and "ma[de] no attempt to show that his appeal, . . . or any other pending litigation, had any merit.").  Thus, to the extent Whiting staff impeded Plaintiff's ability to litigate his habeas cases or appeals in the Second Circuit, these allegations cannot form the basis for an access to courts claim.

The only case to which the Court can apply the "nonfrivolous" test is the single case he identifies by name: *Crispin v. Brady*, No. 21-CV-229.  *See* ECF No. 31 at 34.  But even if this case had merit, court records show that it was not dismissed because Whiting staff obstructed Plaintiff's access to the court.  Rather, these records show that this case was dismissed because Plaintiff failed to pay the filing fee.  *See Brady*, ECF No. 25.  Four of Plaintiff's nine civil rights cases were dismissed while Plaintiff was at Whiting:  *Brady*, *O'Meara*, *Anderson*, and *Sussell*.  *See Brady*,

ECF No. 25 (January 6, 2022, order of dismissal); *O'Meara*, ECF No. 19 (January 6, 2022, order of dismissal); *Anderson*, ECF No. 14 (January 27, 2022, order of dismissal); *Sussell*, ECF No. 13 (February 4, 2022, order of dismissal). All four cases were dismissed not because Plaintiff did not file a court document, but because he failed to pay the filing fee after his motions to proceed *in forma pauperis* were denied. *Ibid.* Indeed, Plaintiff maintains in his amended complaint that his cases were dismissed "do [sic] to experiencing extreme homeless[ness]," ECF No. 31 at 42, not because Whiting staff obstructed Plaintiff's access to the court.

Moreover, even though these cases were dismissed while Plaintiff was at Whiting, judges in these cases warned Plaintiff well before he arrived at Whiting that failure to pay the filing fee would result in dismissal of the cases. *See Brady*, ECF No. 27 (May 12, 2021, order requiring Plaintiff to pay filing fee within twenty days or case would be dismissed); *Sussell*, ECF No. 7 (July 9, 2021, order requiring Plaintiff to pay filing fee by August 9, 2021, or case would be dismissed); *Anderson*, ECF No. 7 (July 19, 2021, order requiring Plaintiff to pay filing fee by August 19, 2021, or case would be dismissed); *O'Meara*, ECF No. 18 (December 16, 2021, order requiring Plaintiff to pay filing fee by January 5, 2022, or case would be dismissed).

Thus, in direct contradiction of Plaintiff's allegations that Whiting staff refused to mail out "any and all" of his legal mail, ECF No. 31 at 34, this Court's own records show not only that Plaintiff was successfully able to file pleadings in his civil rights cases while at Whiting, but also that the cases dismissed while Plaintiff was at Whiting were dismissed because he did not pay the filing fees—not because Whiting staff interfered with his ability to litigate those cases. Thus, Plaintiff's several assertions that Whiting staff interfered with his access to courts in his civil rights cases need not be considered true when viewed against this Court's records. *See*, *e.g.*, *Baldini v. Shah*, No. 17CIV8260ATJLC, 2018 WL 11226079, at *1 (S.D.N.Y. Aug. 9, 2018) ("The Court

does not accept as true any allegations that constitute legal conclusions, or that are directly contradicted by court records.").  Providing no other allegations beyond his assertions contradicted by his own complaint and the Court's own records, the Court cannot conclude from Plaintiff's allegations that any Defendants hindered Plaintiff's efforts to pursue a "nonfrivolous" legal claim, *Christopher*, 536 U.S. at 414–15, such that he can show constitutional injury.  This claim remains dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

D. Fourth Amendment Claim

Plaintiff asserts two Fourth Amendment violations: 1) unreasonable search; and 2) improper issuance of an arrest warrant.  The Court will address each in turn.

*1. Unreasonable Search*

First, Plaintiff asserts that he was unreasonably searched when he was stripped of his pants in front of other individuals.   The Fourth Amendment protects against "unreasonable" governmental "searches and seizures."  U.S. Const. amend. IV.   However, the "proscription against unreasonable searches does not apply within the confines of the prison cell."  *Hudson v. Palmer*, 468 U.S. 517, 526 (1984).

The Second Circuit has recognized that a prisoner has a privacy interest concerning the "involuntary viewing of private parts of the body by [prison officials] of the opposite sex."  *See Forts v. Ward*, 621 F.2d 1210, 1217 (2d Cir. 1980).  Courts in this Circuit, however, "distinguish between 'regular' and 'close' viewings of a naked prisoner of the opposite sex and 'incidental' and 'brief' viewings and find viewings of the latter type constitutional."  *Langron v. Koniecko*, No. 3:21-CV-1531 (MPS), 2021 WL 5827065, at *2 (D. Conn. Dec. 8, 2021); *see also Holland v. City of New York*, 197 F. Supp. 3d 529, 543 (S.D.N.Y. 2016) (collecting cases); *Little v. City of New York*, No. 13 CV 3813 (JGK), 2014 WL 4783006, at *2 (S.D.N.Y. Sept. 25, 2014) (discussing

strip searches by officers of the opposite sex and noting that "'incidental' and 'brief' viewing of a naked prisoner" is constitutional).

Plaintiff alleges that his pants were ripped off, exposing his genitalia and buttocks in the presence of medical staff. ECF No. 31 at 29. The Court previously dismissed this claim because Plaintiff did not allege facts sufficient for this Court to determine whether Plaintiff's exposure was more than a brief incident and because he did not identify who ripped his pants off. ECF No. 28 at 22. Plaintiff's amended complaint still does not identify who ripped his pants off. *See* ECF No. 31 at 29. Even if Plaintiff provided this fact, though, the brief exposure of his genitalia and buttocks does not rise to a Fourth Amendment violation. *See, e.g., Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 63 (2d Cir. 2009) (holding that "briefly 'seeing' a man's genitals during a clothing exchange does not amount to a strip search."). Accordingly, this claim remains dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 2. Improper Issuance of Arrest Warrant

Plaintiff also asserts that an arrest warrant was improperly issued without probable cause in violation of his Fourth Amendment rights. *See* ECF No. 31 at 2. The Fourth Amendment of the U.S. Constitution only permits an arrest warrant to be issued upon a showing of probable cause that is supported by an oath or affirmation and particularly describes the person to be seized. In doing so, it protects the right to be free from unreasonable search and seizure. *See* U.S. Const. amend. IV. False arrest or false imprisonment may constitute the basis for a claim that a plaintiff has been unreasonably seized in violation of the Fourth Amendment. *See Russo v. City of Bridgeport*, 479 F.3d 196, 203–04 (2d Cir. 2007). But such a claim requires that the plaintiff allege facts to show that he was arrested or imprisoned without probable cause. *Id.* Plaintiff has failed to do so.

The details of this alleged Fourth Amendment violation are generally unclear. The Court has identified two points in the amended complaint where Plaintiff references a lack of probable cause or an arrest. *See* ECF No. 31 at 33, 38; *see also id.* at 30 (stating that Jane Doe #6 was "filing criminal charges"). But these references do not clearly indicate what Plaintiff was arrested for, why he believes any warrant for his arrest was not supported by probable cause, or any other flaw in the process used to obtain the warrant. Therefore, Plaintiff's claim that the arrest warrant was improperly issued without probable cause is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

E. <u>Sixth Amendment Claim</u>

Plaintiff also asserts a constructive denial of counsel in a criminal proceeding claim, in violation of his Sixth Amendment rights.[9] This allegation appears to be in connection with the criminal proceeding that arose following the Whiting incident and is raised against a series of attorneys who seem to have represented Plaintiff in that matter. *See generally* ECF No. 31 at 33, 35–36, 39, 42–52. Plaintiff again brings this claim under section 1983, which "provides a federal cause of action against any person who, *acting under color of state law*, deprives another of his federal rights." *Conn v. Gabbert,* 526 U.S. 286, 290 (1999) (emphasis added) (citing 42 U.S.C. § 1983). Accordingly, a plaintiff must show a violation of a federally protected constitutional or statutory right which was the result of state action, or action "under color of law." *See Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir. 1994). A court-appointed attorney "performing a lawyer's traditional functions as counsel" to a party is not a state actor under Section 1983. *Rodriguez v. Weprin*, 116 F.3d 62, 65–66 (2d Cir. 1997); *Barfield v. Milling*, No. 3:14-CV-914 (VAB), 2015 WL 1737671, at *4 (D. Conn. Apr. 16, 2015) (collecting cases). Likewise, an attorney who serves

---

[9] Plaintiff asserts a constructive denial of counsel claim in a criminal proceeding under the Fourteenth Amendment. ECF No. 31 at 2. Plaintiff also raises this same claim under the Sixth Amendment. *Id.* As this right is embodied in the Sixth Amendment, the Court analyzes it as such.

as a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a criminal defendant. *Barfield*, 2015 WL 1737671, at *4 (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 317 (1981)).

The Court again assesses whether these Attorney Defendants' actions can be considered state actions under the standard set forth in the initial review order. *See* ECF No. 28 at 8–9. Although Plaintiff has now alleged additional details regarding these Attorney Defendants' alleged actions that violated his constitutional rights, the Court still finds that these allegations do not support a finding that such actions constituted state action. Plaintiff relies on conclusory allegations that each of his attorneys was colluding with the state prosecutor and the judges on the trial to support this claim. But as the Court noted in the initial review order, such allegations are not sufficient to establish state action in a section 1983 claim. *See Storck v. Suffolk Cnty. Dep't of Soc. Servs.*, 62 F. Supp. 2d 927, 940 (E.D.N.Y. 1999) (allegations of conspiracy can be neither vague nor conclusory, but must "allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the alleged conspiracy."); *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) ("[C]onclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights" are insufficient.). Accordingly, Plaintiff cannot state a cognizable claim under section 1983 against any attorney who represented him for his criminal matters, including Attorneys Mark McKey, Peter Harvey, Brittany Paz, John Kaloidis, Ismian Feraizi, George Tarasidis, and Jane Doe #16. Therefore, such claims must be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

F.   Eighth/Fourteenth Amendment Claims

Plaintiff's status as either a convicted prisoner or a pretrial detainee dictates whether his claims are analyzed under the Eighth or Fourteenth Amendment.  *See Darnell v. Pineiro*, 849 F.3d 17, 29–35 (2d Cir. 2017).  It is not clear from Plaintiff's amended complaint whether he was a sentenced inmate when the alleged constitutional violations at Whiting occurred.  Thus, it is not clear that the Eighth Amendment—which protects prisoners from "cruel and unusual punishment" at the hands of prison officials—governs his claims of excessive force and deliberate indifference, or if the Fourteenth Amendment—which governs excessive force and deliberate indifference claims against unsentenced inmates—applies.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Koram v. Conn. Dep't Corr.*, No. 3:23-CV-729 (KAD), 2023 WL 4669533, at *1 (D. Conn. July 20, 2023) (citing *Darnell*, 849 F.3d at 29–35).

Because the Court cannot now resolve the ambiguity, the Court analyzes Plaintiff's claims of excessive force and deliberate indifference under both the Fourteenth Amendment and the Eighth Amendment.  *See Darnell*, 849 F.3d at 35 (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015)) (explaining that a Fourteenth Amendment deliberate indifference claim only requires a showing of objective deliberate indifference, whereas an Eighth Amendment claim requires a subjective showing).

*1. Excessive Force: Fourteenth Amendment*

The Due Process Clause of the Fourteenth Amendment protects a pretrial detainee from the use of excessive force that amounts to punishment, and from actions that are not rationally related to a legitimate, nonpunitive government purpose or actions that are excessive in relation to that purpose.  *See Kingsley*, 576 U.S. at 397–400; *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 251–52 (2d Cir. 2020).

24

To prevail on a claim of excessive force in violation of the Fourteenth Amendment, a plaintiff must show "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396–97. In other words, a plaintiff must demonstrate both (1) the defendant's purposeful or knowing state of mind, and (2) the objective unreasonableness of his use of force. *See id.* This standard cannot be applied "mechanically"; rather, it "turns on the facts and circumstances of each particular case." *Id.* at 397 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998); *Graham v. Connor*, 490 U.S. 386, 396 (1989)). A court must apply this standard in light of the facts known to the defendant at the relevant time. *See Frost*, 980 F.3d at 252 (citing *Kingsley*, 576 U.S. at 399).

As to the first element, a defendant must have possessed "a purposeful, a knowing, or possibly a reckless state of mind" to be liable for excessive force. *Kingsley*, 576 U.S. at 396. The second element considers whether the force employed was objectively unreasonable. *Id.* at 397. The force employed will be deemed objectively unreasonable if it was "not rationally related to a legitimate governmental objective," or if it was "excessive in relation to that purpose." *Edrei v. Maguire*, 892 F.3d 525, 535–36 (2d Cir. 2018) (citing *Kingsley*, 576 U.S. at 398, and *Lewis*, 523 U.S. at 846).[10]

"The Supreme Court has suggested that the following factors bear on the objective reasonableness of force used: 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Lewis v. Huebner*, No. 17-CV-8101 (KMK), 2020 WL 1244254, at *5 (S.D.N.Y. Mar. 16, 2020) (quoting *Kingsley*, 576

---

[10] In *Edrei*, the Second Circuit held that "*Kingsley* provides the appropriate standard for all excessive force claims brought under the Fourteenth Amendment." 892 F.3d at 537.

U.S. at 397).  Further, "courts considering the reasonableness of force under the Fourteenth Amendment must account for the 'legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that . . . are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (quoting *Kingsley*, 576 U.S. at 397).

Courts give great deference to the judgment of mental health professionals about what degree of force or restraint is necessary for reasons of safety in the context of treating a mental health patient.  That is the long-established rule of *Youngberg v. Romeo*, 457 U.S. 307 (1982), a case involving in part a constitutional challenge to the use of physical restraints against intellectually disabled residents of a state-run facility.  The Supreme Court ruled there that the State had an "unquestioned duty to provide reasonable safety for all residents and personnel within the institution," and that "it may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training." *Id.* at 324.  It emphasized that "mental health professionals' treatment decisions are 'presumptively valid,' and this presumption is overcome 'only when the decision by the professional is . . . a substantial departure from accepted professional judgment, practice, or standards.'" *Monaco v. Sullivan*, 737 F. App'x 6, 11 (2d Cir. 2018) (summary order) (quoting *Youngberg*, 457 U.S. at 323).

Accordingly, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323.  In other words, "decisions made by the appropriate professional are entitled to a presumption of correctness," and mental health professionals "should not be required to make each decision in the shadow of an action for damages." *Id.* at 324–25; *see also Lurch v.*

*Chaput*, No. 22-798-pr, 2023 WL 2469943, at *2 (2d Cir. Mar. 13, 2023) (summary order) (quoting *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996) (affirming grant of summary judgment for doctor and nurse against claim that they improperly used restraints and involuntary medication and noting that "[w]ith physical restraint and forcible administration, a medical professional is not liable unless the decision is a 'substantial departure from accepted judgment, practice, or standards.'")).

Plaintiff alleges several incidents of physical contact with staff, but not all can be considered excessive uses of force. First, Plaintiff alleges Jane Doe #6 "shoved [him] extremely violently and roughly" after Plaintiff tried to grab milk and cereal. ECF No. 31 at 22. Second, Plaintiff alleges two male Forensic Treatment Specialists later "grabbed [Plaintiff] extremely rough[ly]" while forcing him into the time-out room. *Id.* at 27. Third, Plaintiff alleged that when he "darted out" of the time-out room against the orders of Dr. Jane Doe #1 and Nurse Jane Doe #2 to remain there, eight staff members (Defendants Jane Doe #6 and John Does #3 through #5 and #7 through #10) "[f]ootball[-]piled" onto him, twisting his arms and legs. *Id.* at 28.

Taking the allegations of the amended complaint as true, Jane Doe #6's use of force was purposeful and unreasonable because it was "not rationally related to a legitimate governmental objective," *Edrei*, 892 F.3d at 535–36—it was simply an act of punishment for grabbing food. *See Kingsley*, 576 U.S. at 397–98 (acknowledging that the Supreme Court has held that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment" and that "such 'punishment' can consist of actions taken with an 'expressed intent to punish.'" (internal citations and quotation omitted)). By contrast, the other two incidents of physical contact with hospital staff, while likewise purposeful, were rationally related to a governmental purpose and were not excessive in relation to that purpose.

Physically forcing Plaintiff into the time-out room and then restraining him after he tried to escape from it are rationally related to the legitimate governmental objectives of "maintaining institutional security and effectively managing the facility." *Torres v. Stewart*, 263 F. Supp. 2d 463, 468 (D. Conn. 2003) (citing *Bell v. Wolfish*, 441 U.S. 520, 540 n. 23 (1979)). Plaintiff alleges hospital staff "ordered" him into the time-out room. ECF No. 31 at 25. Plaintiff resisted this order, claiming that entering the time-out room would result in his "immediate mental decompensation." *Id.* at 26 (caps omitted). Only after Plaintiff resisted staff's orders to enter the time-out room did Dr. Jane Doe #1 order hospital staff to physically force him into the time-out room. *See id.* Hospital staff's act of "grabb[ing] [Plaintiff] extremely rough[ly]" only to enforce Dr. Jane Doe #1's order to enter the time-out room furthered a legitimate government objective of maintaining security and effectively managing the facility and thus cannot be considered excessive force. *See e.g.*, *Frost*, 980 F.3d at 256 (affirming dismissal of excessive force claim where defendants had to use force to extract the plaintiff from his cell and the plaintiff struggled with officers, even though the court found that the struggle between the officers and plaintiff could have been gentler). The same is true when hospital staff (Jane Doe #6 and John Does #3 through #5 and #7 through #10) "[f]ootball[-]piled" onto Plaintiff as he attempted to exit the time-out room against Dr. Jane Doe #1 and Nurse Jane Doe #2's orders to remain there. *See id.*

Because hospital staff's use of force related to Plaintiff's entry and exit from the time-out room was rationally related to the legitimate governmental objective of maintaining institutional security and effectively managing the facility, this use of force was not constitutionally excessive. But because Jane Doe #6's use of force was unrelated to a legitimate governmental purpose, Plaintiff's Fourteenth Amendment excessive use of force claim against her may proceed.

### 2. *Excessive Force: Eighth Amendment*

Plaintiff also states a plausible claim for use of excessive force under the Eighth Amendment against Jane Doe #6.  To state a claim for use of excessive force in violation of the Eighth Amendment, Plaintiff must allege facts establishing both objective and subjective components.  *See Sims v. Artuz*, 230 F.3d 14, 20–21 (2d Cir. 2000).  "This objective component is 'contextual and responsive to contemporary standards of decency.'"  *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).  "In the excessive force context," "standards of decency always are violated" "[w]hen prison officials maliciously and sadistically use force to cause harm," regardless of "whether or not significant injury is evident." *Hudson*, 503 U.S. at 9.  "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct."  *Harris v. Miller*, 818 F.3d 49. 63 (2d Cir. 2016) (internal citations and quotation marks omitted).

As the Court has already explained, Plaintiff alleges Jane Doe #6 "shoved [him] extremely violently and roughly" after Plaintiff tried to grab milk and cereal.  *See* ECF No. 31 at 22.  This allegation satisfies the objective component because Jane Doe #6's act could be considered malicious or sadistic.  *Sims*, 230 F.3d at 21 ("In an excessive-force case, whether conduct was 'wanton' turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'") (quoting *Hudson*, 503 U.S. at 7)).  While Plaintiff has not expressly stated that Jane Doe #6 acted wantonly, the Court finds that Plaintiff has alleged as much because Jane Doe's #6 use of force, provoked only by Plaintiff asking for breakfast, cannot be considered to have been "applied in a good-faith effort to maintain or

restore discipline." *Id.* Accordingly, Plaintiff has also plausibly alleged an Eighth Amendment excessive force claim against Jane Doe #6 for purposes of initial review.

Any Eighth Amendment excessive force claim against other Defendants related to Plaintiff's entry into and exit from the time-out room fails. For similar reasons described above, hospital staff forcibly placed Plaintiff into the time-out room and forcibly restrained him after escaping it "in a good-faith effort to maintain or restore discipline," not "maliciously and sadistically to cause harm.'" *Sims*, 230 F.3d at 21. Thus, the Eighth Amendment claims against other Defendants remain dismissed.

The Court notes that Plaintiff will ultimately be able to proceed only on *either* the Fourteenth Amendment excessive force claim *or* the Eighth Amendment excessive force claim against Jane Doe #6, depending on his status as either a pretrial detainee or sentenced prisoner on the date of the assault. Jane Doe #6 is encouraged to move to dismiss the inapplicable claim after investigating Plaintiff's status on the relevant date.

### 3. Deliberate Indifference to Mental Health Needs: Eighth and Fourteenth Amendments

The Court construes the Plaintiff's amended complaint as alleging both Eighth and Fourteenth Amendment claims based on deliberate indifference to his mental health needs.[11] Deliberate indifference claims of sentenced inmates are considered under the Eighth Amendment while deliberate indifference claims of pretrial detainees are considered under the Fourteenth Amendment. *Darnell*, 849 F.3d at 29. Because the Court cannot discern from the amended

---

[11] In the amended complaint, Plaintiff also asserts a claim for "denial of treatment." Denial of treatment claims are generally analyzed under the deliberate indifference standard. *See Estelle*, 429 U.S. at 104. Although Plaintiff does not specify how he was denied treatment, the Court interprets this claim as an assertion of denial of mental health treatment. Therefore, the Court analyzes this claim as an Eighth/Fourteenth Amendment deliberate indifference claim.

complaint whether Plaintiff was a sentenced inmate or a pretrial detainee while at Whiting, the Court analyzes this claim under both Amendments.

A claim for deliberate indifference to serious medical needs has both an objective component and a subjective component. The objective component is the same under the Eighth and Fourteenth Amendments. *Mims v. Laprey*, No. 3:24-CV-238 (SVN), 2024 WL 3090481, at *6 (D. Conn. June 21, 2024) (citing *Darnell*, 849 F.3d at 30) (observing that "a Fourteenth Amendment [deliberate indifference] claim mirrors the Eighth Amendment under the objective prong"). The objective component requires Plaintiff to show that deprivation of medical care was "sufficiently serious." *See Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). This inquiry "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id*. A "sufficiently serious" deprivation can exist if the detainee suffers from an urgent medical condition that can cause death, degeneration, or extreme or chronic pain. *See Brock v. Wright*, 315 F.3d 158, 162–63 (2d Cir. 2003). The Court will assume that Plaintiff's "mental decompensation" is "sufficiently serious," in satisfaction of the objective component. *See*, *e.g.*, *Cruz-Droz v. Marquis*, No. 3:17-CV-1291 (MPS), 2018 WL 1368907, at *5 (D. Conn. Mar. 16, 2018) ("[C]onclud[ing] that plaintiff sufficiently allege[d] that his need for treatment was sufficiently serious, as he suffered from increased anxiety, panic attacks, insomnia, and post-traumatic stress syndrome . . .").

The subjective component under the Eighth Amendment requires a plaintiff to allege that "defendant prison officials possessed sufficient culpable intent." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer,* 511 U.S. at 834). "A prison official acts with sufficient culpable intent 'if he has knowledge that an inmate faces a substantial risk of serious

harm and he disregards that risk by failing to take reasonable measures to abate the harm.'" *Lewis v. Swicki*, 629 F. App'x 77, 79 (2d Cir. 2015) (citing *Hayes*, 84 F.3d at 620; *Farmer,* 511 U.S. at 837–38) (noting that the deliberate indifference inquiry is subjective, requiring awareness of facts from which an inference could be drawn that "substantial risk of serious harm exist[ed]")).

The subjective component under the Fourteenth Amendment "applies a less stringent subjective prong" than under the Eighth Amendment. *Mims*, 2024 WL 309048, at *6 (citing *Darnell*, 849 F.3d at 32). Under the subjective prong of a Fourteenth Amendment claim, the plaintiff must establish that the "officer acted with at least deliberate indifference to the challenged conditions," which means that he or she "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35; *see also Vega v. Semple*, 963 F.3d 259, 273–74 (2d Cir. 2020). Thus, in the Fourteenth Amendment context, the "subjective" prong is defined objectively. *Id.*

Plaintiff fails to allege facts satisfying the subjective component under either the Eighth or Fourteenth Amendments. Even if hospital staff "ha[d] knowledge that [Plaintiff] face[d] a substantial risk of serious harm" in the time-out room due to his mental condition, hospital staff did not "disregard[ ] that risk by failing to take reasonable measures to abate the harm." *Lewis*, 629 F. App'x at 79. Rather, hospital staff "visual[ly] evaluat[ed]" Plaintiff in the time-out room and opened the door to check on him when he began "decompensat[ing]." ECF No. 31 at 27. Thus, Plaintiff has failed to satisfy the subjective component under the Eighth Amendment. *See Farmer*, 511 U.S. at 844 (noting that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk,

even if the harm ultimately was not averted."); *Ford v. Phillips*, No.  05 CIV. 6646 (NRB), 2007 WL 946703, at *12–13 (S.D.N.Y.  Mar.  27, 2007) (concluding plaintiff had not satisfied subjective component because doctor continued to monitor plaintiff's injuries until they subsided).

Plaintiff likewise fails to allege facts satisfying the less demanding subjective component under the Fourteenth Amendment.  Plaintiff alleges no facts showing hospital staff placed Plaintiff in the time-out room with the intent of causing him to decompensate.  Nor has he alleged facts showing hospital staff "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee." *Darnell*, 849 F.3d at 35.  To the contrary, Plaintiff alleges that staff monitored him while in the time-out room and opened the door to "have Plaintiff checked" when the risk became apparent.  ECF No. 31 at 27.  Accordingly, Plaintiff has not alleged facts satisfying the subjective component under the Fourteenth Amendment. *See*, *e.g.*, *Dollard v. City of New York*, 408 F. Supp. 3d 231, 237 (E.D.N.Y. 2019) (concluding that officers did not recklessly fail to act with reasonable care to mitigate a risk because officers summoned an ambulance and placed plaintiff in a nearby chair after plaintiff lost balance and whispered that she could not breathe).

Plaintiff's claims of deliberate indifference to his mental health needs under the Eighth and Fourteenth Amendments are therefore dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 4. Involuntary Medication

The Court previously construed Plaintiff's complaint as asserting a due process claim related to staff involuntarily medicating him. *See* ECF No. 28 at 21.  The Court does the same here.

The Fourteenth Amendment "protects the individual's liberty interest in making the decisions that affect his health and bodily integrity." *Pabon v. Wright*, 459 F.3d 241, 253 (2d Cir.

2006).  A "person has a constitutionally protected liberty interest in refusing unwanted medical treatment."  *Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 278 (1990); *see also Washington v. Harper*, 494 U.S. 210, 221–27 (1990) (recognizing a prisoner's "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs" but holding that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.").  "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *United States v. Hardy*, 724 F.3d 280, 295 (2d Cir. 2013).  A detainee "who has not been convicted of a crime has no lesser right" to "avoiding the unwanted administration" of medication.  *Id.*

But the right to avoid unwanted medication is not absolute: "[t]he right of a prisoner or a detainee to avoid involuntary medication . . . may be outweighed by competing governmental interests, such as the interest of prison administrators in ensuring the safety of prison staffs and administrative personnel." *Id.*  Indeed, "[t]here is a 'legitimate governmental interest in' the involuntary medication of an inmate 'where medically appropriate for the purpose of reducing the danger he poses.'" *Id.* (quoting *Harper*, 494 U.S. at 226).  "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323.

Plaintiff alleges in his amended complaint that Dr. Jane Doe #1 ordered Nurse Jane Doe #2 to forcibly inject Plaintiff with an unknown medication after he "darted out" of the time-out room.  ECF No. 31 at 28–29.  "Courts applying *Harper* in the context of a single administration of antipsychotic medication in response to an emergency situation have relied on the opinion of

the doctor administering the medication." *Riddick v. Chevalier*, No. 3:11-CV-1555 (SRU), 2013 WL 4823153, at *3 (D. Conn. Sept. 9, 2013). Here, a doctor ordered a nurse to forcibly inject Plaintiff with medication after Plaintiff had escaped the time-out room on his hands and knees after telling this doctor and nurse that he needed to get out or he would die. ECF No. 31 at 28. The Court infers from these facts that hospital staff believed that Plaintiff was either a danger to himself or others and that it was "medically appropriate for the purpose of reducing the danger he poses," *Harper*, 494 U.S. at 226, to subdue him with medication. *See Riddick*, *supra*, at *3 (dismissing due process claim alleging involuntary medication where plaintiff was forcibly medicated twice "when he was inflicting self-harm by striking himself repeatedly in the head with the lock on his restraints and banging his head against his cell door."). Accordingly, this claim remains dismissed. *See* 28 U.S.C. § 1915A(b)(1).

G. Fourteenth Amendment Claim

Plaintiff asserts that he was denied equal protection of the law under the Fourteenth Amendment. To state a Fourteenth Amendment equal protection, claim under section 1983, "a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination" and, in the prison setting, he "must demonstrate that his treatment was not "reasonably related to [any] legitimate penological interests." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (alteration in original) (quotation marks and citation omitted). At its core, any equal protection clause claim requires that a plaintiff allege that the Government treated two or more persons or groups differently. *Id.*

The Court need not proceed beyond the first element. Plaintiff has failed to allege any facts to indicate that he was treated differently than any other individual or group. In fact, it is unclear to the Court what exactly Plaintiff intends to argue in raising this claim. For this reason, Plaintiff

fails to state claim under the equal protection clause and this claim must be dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

      H.  <u>Americans with Disabilities Act and Section 504 of the Rehabilitation Act Claims</u>

As to Plaintiff's Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") claims, the standards under Title II of the ADA and section 504 of the RA "are generally the same[.]"  *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir.  2016).[12]  And the ADA and the RA both apply to state prisons and prisoners.  *Wright*, 831 F.3d at 72.

To establish a prima facie violation under Title II of the ADA or the RA, a plaintiff must show: "that 1) he is a qualified individual with a disability; 2) [defendants are] entit[ies] subject to the acts; and 3) he was denied the opportunity to participate in or benefit from [defendants'] services, programs, or activities or [defendants] otherwise discriminated against him by reason of his disability."  *Wright*, 831 F.3d at 72.  There are "three available theories[ ]" of discrimination that can be used to establish the third prong of an ADA and RA claim: "(1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation."  *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir. 2009).

The Court assumes for purposes of initial review that Plaintiff is a qualified individual under the ADA and RA based on his mental illness.  But the Court dismissed this claim because Plaintiff did not specify the theory on which he brings his disability discrimination claims, and the Court could not construe from the allegations any theory of disability discrimination under the ADA or RA.  Neither the ADA nor the RA "applies to claims regarding the adequacy or substance

---

[12] The only difference between the ADA and RA is that the RA applies to entities receiving federal financial assistance while Title II of the ADA applies to all public entities, a distinction not relevant here.  *See Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 320 & n.13 (D. Conn. 2008); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (finding it proper to consider such claims together).  The "distinctions between the statutes are not implicated in this case," so "'we treat claims under the two statutes identically.'"  *Wright*, 831 F.3d at 72 (quoting *Henrietta D.*, 331 F.3d at 272).

of services provided by correctional departments or provides a remedy for medical malpractice." *Reese v. Breton*, No. 3:18-CV-01465 (VAB), 2020 WL 998732, at *5 (D. Conn. Mar. 2, 2020).

Plaintiff still does not allege that he was denied participation in any service, program, or activity because of any disability. Nor do his allegations suggest that he was treated differently or discriminated against because of a disability. *Elbert v. New York State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010) ("Courts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability."). Accordingly, this claim remains dismissed. *See* 28 U.S.C. § 1915A(b)(1).

## I. Protection & Advocacy for Individuals with Mental Illness ("PAIMI") Act Claims

Plaintiff claims that Defendants violated the Protection and Advocacy for Mentally Ill Individuals Act of 1986 ("PAIMI"), 42 U.S.C. §§ 10801 – 10805. ECF No. 31 at 1. But the Supreme Court has held that no basis for a private lawsuit exists, "whether under 1983 or under an implied right of action," unless the "text and structure of a [federal] statute provide[s] . . . [an] indication that Congress intend[ed] to create new individual rights." *Gonzaga University v. Doe,* 536 U.S. 273, 286 (2002). And this Court has already concluded that PAIMI does not provide a private right of action to an individual to enforce the requirements regarding the protection of individuals with mental illness. *See* ECF No. 28 at 24–25. Nothing in Plaintiff's amended complaint undermines this conclusion. Accordingly, Plaintiff's claim under the PAIMI remains dismissed. *See* 28 U.S.C. § 1915A(b)(1).

## J. Federal Patient Bill of Rights Claims

Plaintiff claims violation of the federal Patient Bill of Rights, 42 C.F.R. § 482.13. *See* ECF No. 31 at 1. However, a patients' bill of rights does not generally create enforceable federal rights.

See ECF No. 28 at 25–26; *see also, e.g.*, *Baum v. Northern Dutchess Hosp.*, 764 F. Supp. 2d 410, 426–27 (N.D.N.Y. Jan. 24, 2011) (collecting cases concluding that Patient Bill of Rights statutes do not confer federal rights); *Vaughn v. Ryan Health Care Ctr.*, No. 22-CV-1637 (LTS), 2022 WL 673607, at *4 (S.D.N.Y. Mar. 7, 2022) ("Although it is unclear to which 'Patient's Bill of Rights' Plaintiff refers, state and federal Patients' Bills of Rights generally do not create enforceable federal rights."). Nothing in Plaintiff's amended complaint undermines this conclusion. Accordingly, Plaintiff's claim under the federal Patient Bill of Rights remains dismissed as not plausible. *See* 28 U.S.C. § 1915A(b)(1).

K.   State Law Claims

This Court can exercise supplemental jurisdiction over a state law claim if: (1) there is a claim arising under the federal constitution or federal laws; (2) the relationship between the federal claim and the state claim permits the conclusion that the entire action comprises but one constitutional case; (3) the federal claim has substance sufficient to confer subject matter jurisdiction on the court; and (4) the state and federal claims derive from a common nucleus of operative fact. *Miller v. Lovett*, 879 F.2d 1066, 1071 (2d Cir. 1989), abrogated on other grounds, *Graham v. Connor*, 490 U.S. 386 (1989); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

1.   *Hospital Bill of Rights Claim*

Plaintiff claims a violation of the Hospital Bill of Rights under Connecticut General Statutes § 19a-550. As a threshold matter, there is no indication of a private right of action conferred in section 19a-550, and this Court's research revealed no case law interpreting this statute to establish an enforceable right under that provision. Nothing in Plaintiff's amended complaint undermines this conclusion. Accordingly, the Court declines subject matter jurisdiction over this claim raising a novel interpretation of state law. *See* 28 U.S.C. § 1367(c)(1) ("The district

courts may decline to exercise supplemental jurisdiction over a claim" that "raised a novel or complex issue of State Law . . . ."). Accordingly, this claim remains dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 2. Assault and Battery Claim[13]

In Connecticut, a civil assault is defined as "the intentional causing of imminent apprehension of harmful or offensive contact with another." *German v. Dzurenda*, No. 3:09-CV-1316 (SRU), 2011 WL 1214435, at *22 (D. Conn. Mar. 28, 2011). "[A]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Id.* (quoting *Alteiri v. Colasso*, 168 Conn. 329, 334, n.3 (1975)).

For purposes of this initial review, Plaintiff's allegations are only sufficient to raise an inference that he was subjected to assault and battery by Jane Doe #6. Plaintiff may proceed on assault and battery claims against Jane Doe #6.

### 3. Spoliation[14]

Under Connecticut law, in order to state a claim for intentional spoliation,[15] Plaintiff must plausibly allege: "(1) the defendant's knowledge of a pending or impending civil action involving the plaintiff; (2) the defendant's destruction of evidence; (3) in bad faith, that is, with intent to

---

[13] Plaintiff asserted a claim for assault and battery under the Eighth Amendment. ECF No. 31 at 4. As assault and battery is a state law tort claim, the Court has analyzed it as such.

[14] Plaintiff raises a spoliation of evidence claim, which he asserts is a violation of his Fourteenth Amendment right to due process. Spoliation claims, however, are generally claims raised under state law and generally do not implicate due process when raised outside of the context of discovery or criminal procedure. *See Braun v. Sterno*, No. 3:18-CV-919 (JCH), 2018 WL 5778248, at *6 (D. Conn. Nov. 2, 2018) (collecting cases). As such, the Court analyzes this claim under relevant state law.

[15] Plaintiff does not specify whether he intends to assert a claim of intentional or negligent spoliation. Because Plaintiff uses the word "deliberate" to describe the alleged destruction of evidence, *see, e.g.*, ECF No. 31 at 20, 30, the Court finds that Plaintiff intended to assert only a claim of intentional spoliation.

deprive the plaintiff of his cause of action; (4) the plaintiff's inability to establish a *prima facie* case without the spoliated evidence; and (5) damages." *Rizzuto v. Davidson Ladders, Inc*., 280 Conn. 225, 244–45 (2006). "Additionally, a plaintiff pleading intentional spoliation of evidence must allege that the destroyed evidence was 'vital' to [his] ability to prevail on [his] claims, and [ ]he must allege with specificity which claims might have been litigated but for the spoliation of evidence." *Larsen v. Berlin Bd. of Educ.*, 588 F. Supp. 3d 247, 264 (D. Conn. 2022).

Construing the amended complaint liberally, Plaintiff alleges that he requested that video footage of the alleged incidents at Whiting be preserved, and that Plaintiff provided a statement to John Doe #11, a DMHAS officer regarding the same incidents, but that both were deliberately destroyed. *See* ECF No. 31 at 20–21, 30–31, 42–43. While Plaintiff alleges that this evidence was deliberately destroyed at multiple points of his amended complaint, the only Defendants that he references specifically in relation to these allegations are John Doe #11, who is the DMHAS police officer who took his statement following the incidents at Whiting, John Doe #12, another DMHAS police officer, and Attorney Fitzgerald, the state prosecutor. *See id.* at 6–7, 30–31, 42–43. All other allegations just generally assert that evidence was destroyed by an unnamed individual or individuals. *See, e.g.*, *id.* at 20.

Plaintiff's spoliation allegations are speculative and conclusory, and fail to state a claim. Plaintiff repeatedly states that an unidentified party, Defendant John Does #11 and #12, or Defendant Attorney Fitzgerald destroyed the evidence to cover up the Whiting incidents. But he does not provide information indicating what leads him to believe the evidence was destroyed. Further, Plaintiff states that he did have an opportunity to view at least some video evidence, but that evidence did not show the alleged assault. *Id.* at 42. Plaintiff, therefore, inferred that the relevant video evidence was destroyed without indicating what if any actions he took to clarify

whether other video evidence was available. *Id.* at 43. Plaintiff also says nothing regarding the destruction of the police report other than asserting that it was destroyed as part of an "official cover up." *Id.* at 31. Such allegations, on their own, are insufficient to state a claim. *See Larsen*, 588 F. Supp. 3d at 264-65.

Even if the Court were to accept as true that the video footage and police report were destroyed and that Defendants destroyed this evidence in bad faith, Plaintiff still fails to demonstrate that this evidence was "vital" to his ability to prevail on his claims. Given the number of individuals that Plaintiff alleges participated in or observed the Whiting incident, it seems highly likely that Plaintiff has various other means of establishing what events took place that day through either his own testimony or through witness subpoenas as alternative sources of proof. *See Larsen*, 588 F. Supp. 3d at 265; *Caro v. Weintraub*, No. 3:09-CV-1353 (PCD), 2010 WL 4514273, at *7 (D. Conn. Nov. 2, 2010) (dismissing intentional spoliation claims where plaintiff had access to alternative sources of proof), *aff'd on recon.*, 2011 WL 13234162 (D. Conn. Feb. 14, 2011).

Because Plaintiff fails to allege sufficient facts to state a claim for relief, Plaintiff's spoliation claim is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

## ORDERS

**Based on the foregoing, the Court issues the following orders:**

Plaintiff may seek damages from Forensic Treatment Specialist Jane Doe #6 in her individual capacity on Plaintiff's First Amendment retaliation, Eighth or Fourteenth Amendment excessive force, and state common law assault and battery claims.

All other claims are dismissed, and all other Defendants are terminated. The Court enters the following additional orders:

(1) The Clerk cannot serve Jane Doe #6 without this Defendant's full name and current work address. Thus, Plaintiff is directed to obtain this information for this Defendant and to file a notice containing the information with the Court by **June 23, 2025**. Once this Defendant has been identified, the Court will order that she be served with a copy of the amended complaint. Failure to identify this Defendant within 30 days will result in the dismissal of all claims against her.

(2) If Plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he should indicate all the case numbers in the notification of change of address. He should also notify any Defendant or defense counsel of his new address.

(3) Plaintiff shall utilize the Prisoner Efiling Program when filing documents with the Court.

        **SO ORDERED** at Hartford, Connecticut, this 23rd day of May, 2025.

                                    _/s/ Sarala V. Nagala_
                                    SARALA V. NAGALA
                                    UNITED STATES DISTRICT JUDGE